Argued and submitted April 14, 2010, affirmed March 2, 2011

HAWKINS VIEW ARCHITECTURAL
CONTROL COMMITTEE,
*Plaintiff-Respondent,*

*v.*

Daniel COOPER
and DC Design & Consulting, Inc.,
*Defendants-Appellants.*

Lane County Circuit Court
160816063; A140419

250 P3d 380

Jeffrey E. Potter argued the cause for appellants. With him on the briefs was Gardner, Honsowetz, Potter, Budge & Ford.

Rohn M. Roberts argued the cause for respondent. With him on the brief were Gregory E. Gill and Arnold Gallagher Percell Roberts & Potter PC.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

WOLLHEIM, J.

**WOLLHEIM, J.**

Plaintiff is the Architectural Control Committee of Hawkins View, a planned neighborhood in Eugene. Defendants own a lot in Hawkins View that is subject to the Conditions, Covenants, and Restrictions (CCRs) of Hawkins View. Plaintiff initiated this case, seeking a declaration that the CCRs preclude defendants from building more than one house on their lot and an injunction enjoining defendants from subdividing their lot without homeowner approval as required by the CCRs. The parties filed cross-motions for summary judgment, and the trial court granted summary judgment to plaintiff, along with attorney fees. The judgment declared that defendants could build only one house on their lot and enjoined defendants from subdividing their lot without obtaining the requisite homeowner approval. Defendants appeal, contending that the CCRs are ambiguous and, thus, that issues of material fact preclude summary judgment. We affirm.

On review of a trial court's grant of summary judgment, we view the facts in the light most favorable to the nonmoving party to determine whether there is any genuine issue of material fact. *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). There is no genuine issue of material fact if the record, viewed in a manner most favorable to the adverse party, could not permit an objectively reasonable jury to return a verdict for the adverse party. ORCP 47 C. Accordingly, we state the relevant facts in the light most favorable to defendants.

The Hawkins View subdivision was created in two phases. In 1996, the developer recorded a declaration that created the original subdivision, Phase I. Included in that declaration were the original CCRs, along with a definition of the property subject to the CCRs. The declaration recited: "Declarant owns certain real property in Eugene, Oregon known as Hawkins View more particularly described in Exhibit 'A' attached hereto and incorporated herein ('the Property')." Exhibit A referred to a plat of Hawkins View and provided, "Lots 1-102 of Hawkins View PUD as platted and recorded in File 75 Slides 300-303, Lane County, Oregon, Plat Records, Lane County, Oregon." The plat map referred

to depicts lots 1 to 102 of Hawkins View and an additional lot, 103. The declaration subjected "all the Property, together with any and all properties which may hereafter be added to the planned community pursuant to Section 2.2 hereof to the Covenants, Conditions and Restrictions contained herein." The CCRs defined "Property" as "all real property, improvements and fixtures as described in Exhibit 'A.' "

In Section 2.2, the declarant reserved the right to add additional property to Hawkins View. That section provided:

> "**Additions to Property.** The Development shall initially consist of Property. The Development may be expanded by filing a supplement to this Declaration together with a plat with the County Recorder of Lane County, designating that property to be added to and become subject to the Covenants contained herein. At any time within seven (7) years from the date of filing hereof, the Declarant may add additional property to the Development without the consent of any party. There shall be no limitation on the number of Lots and/or Lots which may be developed in the Development."

(Boldface in original.)

In 1997, as part of Phase 2 of the development, the declarant exercised his authority to add property to Hawkins View by amending Exhibit A, as follows:

> "Pursuant to paragraph 2.2 of the Declaration, Exhibit A is amended and supplemented to add the following described real property as within the Property covered by the Declaration:

> "Lots 1-14 inclusive of Hawkins View PUD, Phase 2, as platted and recorded in File 75, Slides 571 & 572, Lane County Plat Records, Lane County, Oregon."

The amendment to Exhibit A that incorporated Phase 2 into Hawkins View subdivided lot 103 into 14 lots, which are referred to in Section 9 of the fourth amendment as "Lots 1-14." Lots 1 to 13 are one-third of an acre on average. By contrast, lot 14 is nearly 10 acres.

The CCRs created an Architectural Control Committee (ACC), defining the ACC as "the Committee initially formed by the Declarant and later elected by the Homeowners, to review and approve or deny plans and specifications for the design and construction of Improvements within the Development and to undertake such other tasks as may be specified [by] the Declarant or the Homeowners." The declaration charged the ACC with the exclusive "responsibility and authority for enforcing the Covenants Conditions and Restrictions of this Declaration." The declaration also gave the ACC the specific duty of reviewing "plans, specifications, design, construction, and alterations of all Improvements built within the Property."

In October 2007, defendants purchased lot 14 from the declarant. The declarant had marketed lot 14 as having "development potential." After reviewing the CCRs attached to that lot, defendants agreed that it had that potential. However, one restriction imposed by the CCRs is that only one house may be built on each lot. A "lot" is defined as "a distinct parcel of real property designated as a Lot on the final Plat recorded with Lane County, containing a separate tax lot number." Nonetheless, defendants believed that the CCRs permitted them to subdivide lot 14 into multiple lots by recording a new plat with Lane County. In defendants' view, once lot 14 was subdivided, they could build one house on each new lot without violating the one-house-per-lot rule contained in the CCRs.

Plaintiff objected to defendants' development plans. Plaintiff notified defendants that their development plan violated the one-house-per-lot rule because, even if defendants subdivided their lot by recording a new plat with the county, defendants' unilateral action would not transform their single lot into multiple lots as defined by the CCRs. Rather, in plaintiff's view, defendants could effectuate their plan only by amending the CCRs, which required approval by 85 percent of Hawkins View homeowners.

Defendants went forward with their development plans despite the dispute and communicated with the county about subdividing their lot. Plaintiff responded by filing this action seeking a declaration that defendants could build only

one house on their lot and an injunction preventing defendants from filing a new plat with the county unless defendants obtained the necessary homeowner approval to amend the CCRs. Defendants answered and filed a cross-claim, seeking a declaration that the CCRs did not preclude them from subdividing their lot and that "the ACC has no jurisdiction" to stop defendants' plan to subdivide their lot. The parties also sought attorney fees.

The parties filed cross-motions for summary judgment. Plaintiff argued that defendants were limited to building one house on their lot and that defendants could not effectively file a new plat without amending the CCRs, which required 85 percent homeowner approval. Defendants conceded that they were limited to building one house per lot, but argued that there was no restriction on subdividing their lot. The trial court granted plaintiff's motion for summary judgment and entered a general judgment declaring that defendants could not build more than one house on their lot and enjoining defendants from filing a plat that subdivided their lot without approval from 85 percent of the Hawkins View homeowners. The court also entered a supplemental judgment awarding plaintiff attorney fees.

Defendants appeal, assigning error to the trial court's granting of plaintiff's motion for summary judgment and to the court's denial of defendants' motion for summary judgment. Defendants also assign error to the trial court's supplemental judgment awarding plaintiff attorney fees, arguing that, if the trial court erred on the merits, then the award of attorney fees is also error.

■■ The parties renew the arguments that they made to the trial court. Because defendants agree that the CCRs limit lot owners to building one house per lot, we understand the dispute to be whether the CCRs restrict defendants from unilaterally subdividing their lot. Our task, then, is to determine the meaning of the CCRs, using the method described in *Yogman v. Parrott*, 325 Or 358, 361-64, 937 P2d 1019 (1997). We begin by examining the text of the relevant provisions in the context of the document as a whole. If the meaning is unambiguous, our analysis ends. *Id.* at 361. " 'Whether the terms of a contract are ambiguous is a question of law. In the

absence of an ambiguity, the court construes the words of a contract as a matter of law.'" *Id.* (quoting *Eagle Industries, Inc. v. Thompson*, 321 Or 398, 405, 900 P2d 475 (1995)).

■■    If, however, we determine that the text in context is ambiguous, our next step is to examine extrinsic evidence of the contracting parties' intent. *Id.* at 363. The practical construction of the contractual provision applied by the contracting parties and their successors—that is, the manner in which the parties applied the contractual term at issue—is a useful clue to the meaning of a textually ambiguous provision. *Id.* at 364.

■■    Finally, if extrinsic evidence fails to clarify the ambiguity, we turn to maxims of construction. *Id.* The maxim ordinarily applied in this context is that restrictive covenants are to be construed strictly. *Id.* at 366.

■    We begin, then, with the text of the provisions. As a threshold issue, defendants argue that plaintiff, the ACC, is not authorized to bring this action. Four sections of the CCRs discuss plaintiff's authority.

Section 6.1 provides:

"**Architectural Control Committee.**    The responsibility and authority for enforcing the Covenants Conditions and Restrictions of this Declaration shall rest exclusively with the Architectural Control Committee in order to foster uniformity of enforcement and to further the best interests of the Development as a whole. Enforcement may take the form of injunctive or declaratory relief to require compliance without the necessity of proving special or specific harm or the necessity of posting a bond."

(Boldface in original.) That section's broad grant of authority to plaintiff—assigning it exclusive responsibility and authority to enforce the CCRs—appears to answer defendants' argument. Plaintiff brought this action for the purpose of enforcing the CCRs, a responsibility that rests exclusively with plaintiff under Section 6.1. Section 6.3 confirms that interpretation. It provides:

"**Homeowners' Enforcement.**    All requests by Homeowners for enforcement or interpretation of the Covenants,

Conditions, and Restrictions shall be submitted for consideration to the Architectural Control Committee."

(Boldface in original.) Thus, if any homeowner perceives a violation of the CCRs, the homeowner must submit a request to plaintiff for the enforcement or interpretation of the CCRs.

Nonetheless, defendants argue that two other sections of the CCRs, Sections 1.1 and 4.2, assign more narrow duties to plaintiff and limit the authority granted under Section 6.1. Section 1.1 defines "Architectural Control Committee" to mean

"the Committee initially formed by the Declarant and later elected by the Homeowners, to review and approve or deny plans and specifications for the design and construction of Improvements within the Development and to undertake such other tasks as may be specified [by] the Declarant or the Homeowners."

Defendants contend that that definition limits plaintiff's authority to reviewing and approving or denying plans and specifications for the design and construction of improvements within Hawkins View because "[t]here was no evidence that the Declarant or the Homeowners had ever specified any other 'tasks' for [plaintiff] to perform." We disagree, because Section 6.1, quoted above, assigns plaintiff the additional task of enforcing the CCRs.

Next, defendants argue that Section 4.2 also limits plaintiff's authority to approving and denying plans for improvements built in Hawkins View. That section provides:

"**Duties.** The Architectural Control Committee (herein 'Committee') shall be established to review and approve or deny plans, specifications, design, construction, and alterations of all Improvements built within the Property, pursuant to design specifications set out in these Covenants Conditions and Restrictions. The Committee shall consist of three members, at least one of whom shall be an architect, engineer, or contractor or shall have such other similar qualifications. The Committee shall consider the recommendations, if any, of the Declarant and Homeowners for design control and site approval for proposed Improvements, but it shall exercise its own judgment

regarding the proposed Improvements. In approving or denying proposed Improvements, the Committee shall consider whether the Improvement complies with this Declaration, the design guidelines contained herein, and the overall aesthetic quality and feeling of continuity of the Development."

(Boldface in original.) It is true, as defendants contend, that Section 4.2 describes plaintiff's responsibility to review and approve or deny development plans. However, there is no inconsistency between that section and Section 6.1, which assigns exclusive authority to enforce the CCRs to plaintiff. Indeed, many sections of the CCRs set out design standards for the neighborhood that are to be enforced, pursuant to Section 6.1, by plaintiff. Accordingly, we conclude that Sections 1.1, 4.2, and 6.1 are not contradictory and that Section 6.1 expressly grants plaintiff exclusive authority to enforce the CCRs.

■    We next consider whether the CCRs preclude defendants from subdividing their lot without homeowner approval. Section 8.3 provides:

"This Declaration may be amended at any time by an instrument signed by 85% of the total Homeowners of the Property. Any amendment must be properly recorded, if necessary, under the laws of the state of Oregon."

The CCRs define the term "declaration" to mean "the Covenants, Conditions, and Restrictions and all other provisions herein set forth in this entire document, including any amendments or supplements." Thus, the declaration includes the CCRs as well as any provisions set forth in the entire document containing the CCRs, along with any amendments or supplements, and may be amended only with 85 percent homeowner approval. The homeowner approval rule applies not only to the CCRs, but to the entire declaration. Thus, if defendants' lot 14 is part of the declaration, then a subdivision of lot 14 would be subject to the homeowner approval rule of Section 8.3. Whether lot 14, as platted, is part of the declaration is resolved by reference to the 1997 amendment to the declaration, which amended Exhibit A. The declarant filed that amendment when he added property to Hawkins View. Section 9 of the amendment provides:

"Pursuant to paragraph 2.2 of the Declaration, Exhibit A is amended and supplemented to add the following described real property as within the Property covered by the Declaration:

"Lots 1-14 inclusive of Hawkins View PUD, Phase 2, as platted and recorded in File 75, Slides 571 & 572, Lane County Oregon Plat Records, Lane County, Oregon."

That section added lot 14, as platted and recorded, to "the Property Covered by the Declaration." Accordingly, the declaration brought lot 14 within Hawkins View "as platted and recorded." Thus, any subsequent plat that subdivides lot 14 would eliminate the lot 14 that is included within the declaration "as platted and recorded." Put another way, a subdivided lot 14 would be platted differently than lot 14 is currently platted and recorded. Because defendants seek to amend the declaration by recording a new plat, they must comply with Section 8.3, which requires 85 percent homeowner approval before amending the declaration.

Defendants argue that Section 2.2 of the CCRs allows for unlimited creation of lots within Hawkins View. Section 2.2 provides:

"**Additions to Property.** The Development shall initially consist of Property. The Development may be expanded by filing a supplement to this Declaration together with a plat with the County Recorder of Lane County, designating that property to be added to and become subject to the Covenants contained herein. At any time within seven (7) years from the date of filing hereof, the Declarant may add additional property to the Development without the consent of any party. There shall be no limitation on the number of Lots and/or Lots which may be developed in the Development."

(Boldface in original.) Defendants' interpretation of that provision is incorrect. Section 2.2 unambiguously allows expansion of the development, including the number of lots, by the addition of property to the development. However, Section 2.2 does not address the action defendants propose: further subdividing an existing lot.

Context confirms our interpretation. The original declaration created Phase I of the development, which

included lots 1 to102. The declarant left lot 103 *outside* of the development. However, in Phase 2 of the development, the declarant subdivided lot 103 and brought the subdivided lots, including lot 14, *inside* the development, expressly pursuant to Section 2.2.

Because we conclude that the CCRs expressly and unambiguously preclude defendants from subdividing their lot without the mandated homeowner approval, we do not need to address the additional steps of contract interpretation set out in *Yogman*.

In view of our conclusion that the trial court correctly interpreted the CCRs to require homeowner approval for subdivision of lot 14, we conclude that the trial court did not err when it granted plaintiff's motion for summary judgment and declared that defendants could not build more than one house on their lot and enjoined defendants from subdividing their lot without 85 percent homeowner approval. In light of our disposition on the merits, we reject defendants' assignment of error contending that the trial court erred in awarding plaintiff attorney fees.

Affirmed.